# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

Docket No. 15-15465

---

HAROLD SHEEHY,

Plaintiff/Appellant,

vs.

SANTA CLARA VALLEY TRANSPORTATION AUTHORITY,

Defendant/Appellee.

---

Appeal from an Order of the United States District Court
for the Northern District of California

The Honorable Paul S. Grewal, Magistrate Judge, Presiding
U.S. District Court Case No. 14-CV-1325 PSG

---

## BRIEF OF APPELLEE

---

Robert Fabela, General Counsel, SBN 148098
Paul D. Ahn, Senior Assistant Counsel, SBN 244842
Santa Clara Valley Transportation Authority
3331 North First Street, Building C-2
San Jose, California 95134
Telephone No.: 408-321-5550
Facsimile No.:  408-321-7547
robert.fabela@vta.org
paul.ahn@vta.org

**Attorneys for Defendant/Appellee**
**SANTA CLARA VALLEY TRANSPORTATION**
**AUTHORITY**

40230

# **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................1

II.   STATEMENT OF ISSUES ..........................................................1

III.  STATEMENT OF THE CASE .....................................................1

IV.  ARGUMENT ...............................................................................8

     A.    No Genuine Issue Exists as to Whether Sheehy
           is Entitled to Overtime. ......................................................9

          1.   VTA presented overwhelming evidence
               to show that the reasons Sheehy has offered
               for his overtime requests are devoid of merit. ..........9

               a.   Sheehy had sufficient time finish
                    his shift on schedule, but he purposely
                    delayed his run in order to manufacture a
                    fraudulent basis for overtime. ......................10

               b.   Sheehy's bathroom breaks at the end
                    of the run were not a part of his schedule ....12

          2.   Sheehy's self-serving denials, coupled with
               his failure to produce any corroborating
               evidence, is fatal to his case....................................14

               a.   Sheehy's assertion that he was "often
                    late in arrival at the yard" prior to the
                    5-minute schedule is refuted by the record. .15

                b.   Sheehy's assertion that his breaks were
                    authorized is refuted by the record...............17

     B.    Sheehy Cannot Meet His Burden to Show a
           "Willful" Violation. .........................................................21

     C.    Sheehy's Appeal is Frivolous and Sanctionable...............24

          1.   Sheehy and his counsel are subject to sanctions
               for mischaracterizing the record and the law .........25

          2.   Sheehy's counsel has breached their duty in
               pursuing this unjustified appeal..............................28

V.   CONCLUSION ..........................................................................32

## **TABLE OF CONTENTS**

VI.     CERTIFICATE OF COMPLIANCE ..........................................32

VII.    STATEMENT OF RELATED CASE(S)....................................34

# <u>TABLE OF AUTHORITIES</u>

## Federal Cases

*Blue Lake Rancheria v. U.S.* (9th Cir. 2011) 653 F.3d 1112 ...............22

*Brooklyn Sav. Bank v. O'Neil* (1945) 324 U.S. 697, 707 .......................8

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986) ...................9, 14

*Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001)....................9

*FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010) ......................14

*Frunz v. City of Tacoma*, 476 F.3d 661, 665 (9th Cir. 2007)................24

*Lindow v. U.S.*, 738 F.2d 1057, 1061 (9th Cir. 1984) ...........................13

*McConnell*, 661 F.2d at 118-119 ..........................................................28

*Malhiot v. S. California Retail Clerks Union*,
735 F.2d 1133, 1138 (9th Cir. 1984)...........................................25

*Nelson v. Waste Mgmt. of Alameda County, Inc.*,
33 Fed. Appx. 273, 274 (9th Cir. Cal. 2002) ........................21, 22

*Skipper v. Superior Dairies, Inc.* (5th Cir. 1975)
512 F.2d 409, 419.......................................................................26

*Steiner v. Mitchell,* 350 U.S. 247, 256 (1947)......................................26

*Taylor v. Sentry Life Ins. Co.*, F.2d 652, 656-657 (9th Cir. 1984).........28

## Federal Rules

29 CFR 785.18......................................................................................27

## Federal Statutes

29 USC §254(a)(2) ...............................................................................25

# I.   INTRODUCTION

Pursuant to the Appellate Commissioner's Order dated November 18, 2015 [DktEntry: 21], Defendant-Appellee Santa Clara Valley Transportation Authority ("VTA") submits this answering brief and renews its arguments for dismissal and sanctions.

# II.   STATEMENT OF ISSUES

Two issues are presented for review: (1) whether the District Court erred in granting summary judgment in favor of VTA; and (2) whether the Ninth Circuit Court of Appeals should impose sanctions against Plaintiff-Appellant and his counsel for bringing this frivolous appeal under Federal Rules of Appellate Procedure, Rule 38.

# III.   STATEMENT OF THE CASE

Plaintiff-Appellant Harold Sheehy ("Sheehy") is a long-time VTA employee, who has been operating light rail trains for more than two decades.  [ER 65-266.]  For several years leading up to 2013, Sheehy operated Train 10 ("T-10") on the Alum Rock–Santa Teresa line where he travelled back and forth between two terminal stations (i.e. Alum Rock Station and Santa Teresa Station) and brought T-10 from Alum Rock Station back to the storage yard ("the Yard") at the end of his shift. [ER 268, 390.]  Before July 2010, Sheehy never once indicated to VTA that the allotted time for him to bring the train from Alum Rock Station back

to the Yard ("pull-in") was inadequate. [ER 276, 390.]  In fact, he consistently made it back to the Yard ahead of schedule each evening.  [ER 653, 656-658.]

In 2010, the VTA Scheduling Department conducted a routine audit of light rail train schedules and determined that various adjustments were necessary to ensure accuracy and optimize efficiency. [ER 653-654.]  One of these adjustments included shortening the pull-in schedule for the Alum Rock-Santa Teresa line to more closely reflect actual time worked.  [*Id.*]  As a result, of the four VTA trains that were required to pull in from Alum Rock Station at the end of the shift (Trains 1, 9, 10, and 11), two had their schedules shortened by eight minutes and the other two by five minutes. [ER 653-654, 656-658.]  Sheehy's pull-in schedule was one of the two that was shortened by five minutes. [*Id.*]  Consequently, his allotted pull-in time was reduced by five minutes – from 46 to 41 minutes. [ER 653, 654.]

Other than the shortened pull-in time, Sheehy's schedule remained unaffected. [ER 653-654.]  VTA policy guaranteed that Sheehy would be provided 50 minutes for meal/rest time during the workday. [ER 392, 649.]  In fact, what VTA actually provided to Sheehy was significantly greater than 50 minutes. [ER 392.]  Sheehy enjoyed the following schedule both before and after the 5-minute reduction in his pull-in schedule:

- Start at 2:42 p.m. at Civic Center Station heading southbound to Santa Teresa Station.
- Arrive at Santa Teresa Station by 3:19 p.m., leave at 3:36 p.m. (17 minute break at Santa Teresa Station).

2

- Arrive at Alum Rock Station by 4:50 p.m., leave at 5:03 p.m. (13 minute break at Alum Rock Station).
- Arrive at Santa Teresa Station by 6:19 p.m., leave at 6:36 p.m. (17 minute break at Santa Teresa Station).
- Arrive at Alum Rock Station by 7:49 p.m., leave at 8:09 p.m. (20 minute break at Alum Rock Station).
- Arrive at Santa Teresa Station by 9:27 p.m., leave at 9:57 p.m. (30 minute break at Santa Teresa Station).
- Arrive at Alum Rock Station by 11:14 p.m. for pull-in. [ER 392.]

Accordingly, Sheehy took several regularly scheduled breaks at 73-78 minute intervals, totaling 1 hour and 37 minutes for each workday. [ER 267, 392.]

Curiously, however, shortly after Sheehy's pull-in schedule was reduced by *5 minutes*, Sheehy began routinely returning to the yard approximately *15 minutes* behind schedule.[1] [ER 390, 395-637.] On each of these occasions, Sheehy sought overtime pay, indicating that he was "unable to pull in on time due to shortened pull-in schedule." [ER 390, 395-488.] Initially, VTA gave Sheehy the benefit of the doubt and approved his overtime requests for payment. [ER 390.] However, when Sheehy continued to submit duplicative requests, his supervisors became suspicious. [*Id.*] It made no sense that someone who had been routinely pulling into the Yard several minutes early would suddenly require 15 extra minutes of time because of a 5-minute reduction in schedule. [*Id.*] Moreover, there were other

---

[1] While they predominantly consist of 15-minute requests, Sheehy's overtime requests during the nearly three-year period in question range from 13-17 minutes. [ER 395-637.]

light rail operators who regularly operated the same route as Sheehy. Although their pull-in schedules were similarly, if not more adversely, affected by the audit as Sheehy's schedule, none of them ever raised any concerns about their pull-in time being inadequate. [ER 294-295, 390.]

In order to verify whether Sheehy's delay was attributable to the reason that he cited on his overtime requests (i.e. "unable to pull in on time due to shortened pull-in schedule"), VTA conducted a multi-pronged investigation. Superintendent Garry Stanislaw reviewed the train records, and he discovered that Sheehy was lingering at Alum Rock Station approximately 15 *extra* minutes before heading back to the Yard. [ER 295.] Supervisor Janice Broock, who investigated the matter independently, reviewed Sheehy's final arrival and departure times at Alum Rock Station and discovered a troubling pattern – although Sheehy was arriving at Alum Rock Station on time, he was spending upwards of 16 additional minutes at the station *before* heading back to the Yard to complete his workday. [ER 390-391, 639-646.]

More follow-up investigations confirmed that Sheehy was purposely delaying his shift, by taking an unauthorized break near the end of his run. On September 3, 2010, Field Supervisor John Cross went out to the station to see what was causing the delay. [ER 659.] He observed Sheehy arrive at Alum Rock at 11:17 p.m. [ER 659-660.] When Supervisor Cross approached Sheehy to ask

4

about the delays in pulling into the Yard, Sheehy admitted that he used to start the

pull-in process immediately upon arrival at Alum Rock Station and return to the

Yard ahead of schedule but not anymore. [*Id.*] Sheehy went on to explain that

VTA "cut about 7 minutes[2] from my schedule" so he started taking a 10-7B (i.e. a

bathroom break) before starting the pull-in process. [ER 659-660, 662.]  Sheehy

then disappeared into the restroom, and approximately 12 minutes later, left Alum

Rock Station, and called for an offline time at the Yard at 11:58 p.m. [3] [*Id.*]

In February of 2011, Sheehy's union representative, ATU Shop Steward

Randeep Sangha, contacted Superintendent Stanislaw seeking overtime pay for

Sheehy. [ER 295:18-24, 300-380.]  When Superintendent Stanislaw presented Mr.

Sangha with his investigative findings and the bases for the denial of Sheehy's

extra pay requests, Mr. Sangha dropped the matter altogether. [*Id.*]  In spite of the

union representative's tacit acceptance of VTA's investigative findings, however,

Sheehy refused to relent. [ER 295, 391-392.]  And in late May of 2011, Sheehy

started adding another reason – i.e., "10-7(b) at Alum Rock." – as an excuse for his

routine delay on his Extra Pay Requests. [ER 295, 391-392, 488-637.]  Given the

---

[2]     A 5-minute reduction in his schedule would have corresponded to a 7.5-minute reduction in Sheehy's pay due to overtime considerations.

[3]     Sheehy left Alum Rock Station at 11:29 p.m. (i.e. 12 minutes after his arrival at 11:17 p.m.) and called for an offline time at the Yard at 11:58 p.m. [ER 660.] Consequently, on this date, Sheehy's travel time from Alum Rock to the Yard took just 29 minutes – full 6 minutes less than what was allotted according to his adjusted pull-in schedule.

ample opportunities that Sheehy had at various points during his shift to take personal breaks, his supervisors found no legitimate reason to authorize an additional paid break prior to Sheehy's pull-in and continued to deny his requests for extra pay. [ER 392.] Nonetheless, Supervisor Broock, Superintendent Stanislaw, and VTA's HR Analyst Nicolette Cockerill followed up with Sheehy to see if he required accommodations for his purported medical condition that he was claiming necessitated frequent use of bathroom facilities. [ER 296, 384-388, 392.] Despite multiple requests and follow-up notices, Sheehy *never provided* any medical documentation to VTA.[4] [ER 296, 392.]

Dissatisfied with the results, Sheehy once again marshalled support from his union (albeit with a different representative) and sought an Informal Hearing under the collective bargaining agreement. [DktEntry: 16, PDA Decl. iso Motion to Dismiss ("PDA Decl.") ¶2, Exhibit A; ER 151.] When a neutral hearing officer determined that his overtime claims were meritless, Sheehy obtained legal representation from the firm of Neyhart, Anderson, Flynn and Grosboll (i.e. Sheehy's current counsel) and sought Labor Arbitration to appeal the decision. [DktEntry: 16, PDA Decl. ¶2; ER 48-85, 152-154, 296.] After hearing evidence

---

[4]    In response to VTA's interrogatories in the underlying FLSA action, Sheehy identified a condition – benign prostatic hyperplasia – that allegedly causes his prostate to enlarge and make it difficult to empty his bladder. (ER 284-285.) Yet, Sheehy is unsure of its onset, and has failed to produce any records to substantiate this alleged condition. (*Id.*)

from both sides, the neutral arbitrator too found that VTA has presented "ample and convincing evidence that [Sheehy's] delays and overtime at issue in this case were not the result of the five-minute reduction in the schedule but instead [Sheehy's] own manufacture" and ruled that Sheehy's "grievance has no merit." [DktEntry: 16, PDA Decl. ¶3, Exhibit B.]

Sheehy refused to relent. On March 12, 2015, with the help of his counsel, Sheehy filed an FLSA action in the U.S. District Court for his overtime claims. [ER 666-672.] On VTA's motion for summary judgment, the Honorable Magistrate Judge Paul Grewal determined that "there is no genuine issue of material fact in this case" and dismissed Sheehy's case in its entirety. [ER 004.] Yet, Sheehy remained undeterred, and on March 12, 2015, he, again with the help of his counsel, filed the present appeal.

On July 7, 2015, as a professional courtesy, VTA reached out to Sheehy's counsel over the phone and in writing to express concerns about their decision to pursue the present appeal before the Ninth Circuit and sought to resolve this matter informally. [DktEntry: 16, PDA Decl. ¶6, Exhibit D.] Specifically, VTA communicated to counsel that the Appeal Brief (1) mischaracterizes the law and the parties' collective bargaining agreement; (2) ignores undisputed evidence and relies entirely on Sheehy's verifiably false statements; and (3) misrepresents witnesses' testimony by selective omissions and misappropriation, and requested

that they consult with their client about withdrawing the appeal. [*Id.*]  Counsel

remained obstinate in their position over the phone and, shortly thereafter,

responded in writing to affirm that they "do not plan to withdraw the appeal." [*Id.*,

Exhibit E.]

On July 20, 2015, VTA filed a motion for dismissal of frivolous appeal.

[DktEntry 16.]  Sheehy filed a response to the motion and VTA submitted a reply.

[DktEntries 17 & 18.]  After reviewing all of the pertinent papers, on November

18, 2015, the Appellate Commissioner denied the motion to dismiss "without

prejudice to renewing the arguments in the answering brief" and noted that the

"answering brief is due December 23, 2015." [Document 43, filed 11/20/15.]

## IV.   ARGUMENT

"[T]he prime purpose of the [FLSA] was to aid the unprotected, unorganized

and lowest paid of the nation's working population; that is, those employees who

lacked sufficient bargaining power to secure for themselves a minimum

subsistence wage." *Brooklyn Sav. Bank v. O'Neil* (1945) 324 U.S. 697, 707.  In

bringing this appeal, Sheehy attempts to turn the very purpose of the FLSA on its

head.  Overwhelming evidence, which Sheehy cannot legitimately deny, exists to

show that no genuine issue exists as to his overtime claims.  In fact, he purposely

delayed his schedule and sought overtime compensation.  Despite Sheehy's

actions, VTA continued to engage the employee to see whether he required

8

accommodation in the workplace.  No violation of the FLSA, much less a "willful" violation that would trigger a three-year statute of limitations, exists in the instant matter.  Sheehy's appeal, which mischaracterizes the record and the law, is frivolous and sanctions are appropriate.

**A.    No Genuine Issue Exists as to Whether Sheehy is Entitled to Overtime.**

The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Devereaux v. Abbey,* 263 F.3d 1070, 1076 (9th Cir. 2001) (quoting *Celotex,* 477 U.S. at 325). Once the moving party meets this burden, the nonmoving party may not rest upon mere allegations or denials, but must present evidence sufficient to demonstrate that there is a genuine issue for trial. *See id.*

VTA, in its motion for summary judgment, presented overwhelming evidence to show that the reasons Sheehy cited for overtime are factually unsupported.  In response, Sheehy failed to produce any evidence to create a genuine issue of material fact.

**1.    VTA presented overwhelming evidence to show that the reasons Sheehy has offered for his overtime requests are devoid of merit.**

Reasons that Sheehy provided for overtime are two-fold: (1) due to a shortened schedule, he was unable to finish his shift on time; and (2) he had to use the bathroom at the end of his shift. Here, VTA has presented sufficient evidence to demonstrate that neither of these reasons entitles Sheehy to overtime compensation.

### a. Sheehy had sufficient time finish his shift on schedule, but he purposely delayed his run in order to manufacture a fraudulent basis for overtime.

As the primary reason for his requests for overtime, Sheehy indicated on numerous extra pay requests that he was "unable to pull-in on time due to shortened pull-in schedule." [ER 390, 395-637.] Nonetheless, Sheehy's excuse that a 5-minute reduction in his schedule caused a 15-minute delay is baseless in fact. Simple math precludes the possibility that reducing 5 minutes from one's schedule could create a 15-minute delay. Leaving no genuine issue of fact, however, VTA presented ample evidence to show that Sheehy's delays had little to do with the purported 5-minute schedule change but that Sheehy deliberately postponed his return to the Yard to seek overtime compensation.

Evidence that VTA presented is overwhelming on this point. Prior to the schedule change, Sheehy never once indicated to VTA that the time allotted for him to bring the train back to the yard (i.e. "pull-in time") was inadequate. [ER 276, 390.] VTA produced testimony from Light Rail Superintendent Stanislaw

who, in considering Sheehy's overtime requests, reviewed Sheehy's train records and found that prior to the 5-minute schedule change, Sheehy was "consistently returning to the yard several minutes ahead of schedule." [ER 294.] Stanislaw's testimony was further corroborated by data produced by Transit Service Development Supervisor Kermit Cuff. Mr. Cuff, who is responsible for making light rail schedule adjustments at VTA, produced copies of the Supervisory Control Acquisition Reports ("SCADA Reports"), which showed that, prior to the schedule change, Sheehy (identified as "Badge 2531" in the reports) consistently made it back to the Yard several minutes ahead of schedule each night. [ER 652-658.] VTA also produced testimony from Light Rail Supervisor Broock, who independently reviewed Sheehy's arrival time records. She produced copies of Sequence of Field Events Reports to show that on dates that Sheehy sought an average of 15 minutes overtime pay, he had no problems arriving at Alum Rock Station on time. Curiously, however, Sheehy spent an additional 15 minutes at the station before returning to the Yard, thus delaying his schedule. [ER 390, 391, 638-646.] Finally, VTA produced testimony from Field Supervisor John Cross, who went out to Alum Rock Station to observe what was happening at the station. On September 3, 2010, Supervisor Cross saw Sheehy's train arrive on time, however, Sheehy disappeared into the restroom and delayed his return to the Yard by 12 minutes. [ER 659-660.] Supervisor Cross noted that on that evening, Sheehy left

11

Alum Rock Station at 11:29 p.m. (12 minutes after his arrival at 11:17 p.m.) and called for an offline time at the Yard at 11:58 p.m. [ER 660.] Sheehy's travel time from Alum Rock Station to the Yard was just 29 minutes – full 6 minutes less than what was required by the shortened pull-in schedule, which conclusively showed that the 5-minute schedule adjustment had little to do with Sheehy being late; his shift was delayed, because Sheehy decided to disappear into the bathroom at the end of his run.

### b. Sheehy's bathroom breaks at the end of the run were not a part of his schedule.

In addition to his claim that the shortened schedule prevented him from returning to the Yard on time, Sheehy began adding another reason to his extra pay requests in May 2011. In each request dated on or after May 25, 2011, Sheehy indicated that he is entitled to overtime because he "also [took a] 10-7B[5] at Alum Rock [Station]." [ER 488-637.] Sheehy's excuse presupposes that such breaks were authorized. VTA has produced evidence to show that this simply is not the case. Sheehy's complete schedule (both before and after the schedule change), as outlined by Supervisor Broock, was as follows:

- Start at 2:42 p.m. at Civic Center heading southbound to Santa Teresa.
- Arrive Santa Teresa 3:19 p.m., leave 3:36 p.m. (17 minute break at Santa Teresa).
- Arrive Alum Rock 4:50 p.m., leave 5:03 p.m. (13 minute break at Alum Rock).

---

[5]     "10-7B" is a bathroom break. [ER 267:9.]

- Arrive Santa Teresa 6:19 p.m., leave 6:36 p.m. (17 minute break at Santa Teresa).
- Arrive Alum Rock 7:49 p.m., leave 8:09 p.m. (20 minute break at Alum Rock).
- Arrive Santa Teresa 9:27 p.m., leave 9:57 p.m. (30 minute break at Santa Teresa).
- Arrive Alum Rock 11:14 p.m.

[ER 392.]

Clearly, a 15-minute break at Alum Rock Station at the end of his shift was not a part of Sheehy's schedule.

Given this crucial point, Sheehy's argument that the FLSA and the parties collective bargaining agreement ("CBA") require overtime payment for his arbitrary breaks is inapposite to the facts of this case.[6] Neither the FLSA nor the CBA requires payment for such *unauthorized* breaks, which cannot qualify as "time worked" under the law. See *Lindow v. U.S.*, 738 F.2d 1057, 1061 (9th Cir. 1984) (indicating that preliminary or postliminary activities performed for an employee's own convenience are not compensable.) Specifically in the CBA, the breaks contemplated (i.e. "meal/rest periods" of at least fifty minutes in duration)[7]

---

[6]      Sheehy indicates "[i]t is long-established that rest periods (of 5 to 20 minutes) are compensable time under the FLSA… This long-established legal principle is also found in the text of the collective bargaining agreement ('CBA') between VTA and Mr. Sheehy's union, ATU, Local 265." [Appellant's Opening Brief, p.23.]

[7]      The parties collective bargaining agreement provides that "[a]ll Meal/Rest periods where applicable are paid and computed as time worked… Rail Operators shall be entitled to at least fifty minutes total meal/rest time for straight runs or straight full time work periods." [ER 186.]

were those that VTA already built into Sheehy's schedule. In fact, VTA provided Sheehy significantly more break time than what was minimally required by contract (i.e. "at least fifty minutes") – Sheehy enjoyed 1 hour and 37 minutes of break time at regular intervals throughout his workday (i.e. every 73-78 minutes during the revenue service portion of his shift). [ER 267:12-17, 392.] Based on these irrefutable facts, Sheehy's insistence that he is entitled to additional overtime pay for an arbitrary break is devoid of any merit.

**2.    Sheehy's self-serving denials, coupled with his failure to produce any corroborating evidence, is fatal to his case.**

In cases where the non-moving party merely presents his own denial of the facts in a declaration, "[the court] need not find a genuine issue of fact if, in its determination, the particular declaration was 'uncorroborated and self-serving'" [internal citations omitted] *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1159 (9th Cir. 2010). Here, Sheehy's self-serving declaration introduced as "evidence" is entirely uncorroborated. Specifically, Sheehy indicated the following: (1) "[p]rior to July 2010, I was often late in arrival at the rail yard" [ER 42:14]; and (2) "VTA did not require me to request approval from the dispatcher (or any other person) before taking a 10-7B at Alum Rock station." [ER 42:26-28.] These blanket denials fail to raise a genuine issue as they are unsupported by evidence and are clearly refuted by the record.

### a. Sheehy's assertion that he was "often late in arrival at the yard" prior to the 5-minute schedule is refuted by the record.

In response to the overwhelming evidence VTA produced to show that Sheehy had sufficient time to return to the Yard at the end of his shift, Sheehy claims that "[p]rior to July 2010, I was often late in arrival at the rail yard but rarely requested overtime if I was late." [ER 42:10-15.] The reason for this assertion is clear: Sheehy hopes to explain how a 5-minute reduction in his schedule could have resulted in routine 15-minute delays. His excuse is that he was already having difficulty returning to the Yard on time when VTA reduced his schedule by 5 minutes; and the schedule change further exacerbated his ability to return to the Yard on time. This self-serving assertion is not only uncorroborated but clearly refuted by the evidence.

First of all, Sheehy fails to present any evidence to support his contention that, prior to July 2010, he was "often late in arrival at the yard." He fails to produce a single train record or a field data report to show that he ever pulled his train into the Yard late prior to July 2010. Likewise, Sheehy's failure to produce a single extra pay request from prior to the schedule change makes his claim that he "rarely requested overtime" all the more unconvincing.[8] Given the lack of any

---

[8] Sheehy's assertion that he "rarely requested overtime" before the schedule change is surprising when one considers the fact that he had no problems asking seeking overtime nearly every day for three years after the schedule change. Moreover, he had no problems producing as evidence 483 copies of extra pay

supporting evidence, his self-serving assertion is insufficient refute Supervisor Broock's testimony that "[p]rior to July of 2010, Sheehy never once indicated to VTA that the time allotted for him to bring the train back to the yard (i.e. 'pull-in time') was inadequate." [ER 390:6-7.]

Further posing an obstacle to Sheehy's overtime claim is that his self-serving assertion is directly refuted by his own declaration. According to Sheehy, the scheduled time of arrival at the Yard "[d]uring the period from July 2010 until mid 2013" (i.e. after the 5-minute reduction in schedule) was "either 11:55, 11:56 or 11:57 p.m." [ER 42:16-19.] If the Court were to take Sheehy's words at face value, prior to July 2010 (i.e. before the 5-minute reduction in schedule), Sheehy's scheduled time of arrival at the Yard would have been 12:00, 12:01, or 12:02 a.m. Therefore, in order for his statement (i.e. "Prior to July 2010, I was often late in arrival at the rail yard…") to be true, Sheehy had to have been arriving at the Yard after midnight. Even a cursory examination of the evidence reveals that Sheehy's statement is false. VTA produced SCADA reports from early 2010 that tracked, in part, 37 trips that Sheehy made at the end of the night from Alum Rock Station to the Yard. Never mind "often," Sheehy was not late in any one of the 37 instances

---

requests (from after the schedule change) for the purposes of the underlying lawsuit.

recorded in the SCADA Report.[9]  In fact, the record reveals that, prior to the schedule change, Sheehy regularly arrived back at the Yard *several minutes before* midnight.

Finally, Sheehy's self-serving denial is directly refuted by his supervisors' testimony.  Although other operators who drove the same route were affected equally (if not more adversely) by the schedule change, Superintendent Garry Stanislaw confirmed that none of them ever raised any concerns about their pull-in time being inadequate. [ER 294-295, 390.]  Despite being represented by counsel whose firm exclusively represents all VTA light rail operators in labor related matters, Sheehy has failed to produce a single shred of evidence to refute Stanislaw's testimony.  In fact the record is incontrovertible: "[p]rior to the schedule change in July of 2010, Sheehy's records showed that he was consistently returning to the Yard s*everal minutes ahead of schedule.*" [ER 295:3-4, emphasis added.]  No factual basis exists to support Sheehy's self-serving denial that he was often late in arrival at the Yard.

### b. Sheehy's assertion that his breaks were authorized is refuted by the record.

Sheehy's argument that his arbitrary breaks at Alum Rock Station are compensable under the FLSA is based on the premise that those breaks were

---

[9]     Note the columns labeled "Departure from ALMR" and "Arrival at YARD" information for Sheehy (Operator Badge ID 2531) on the SCADA report. [ER 653:6-22, 656-658.]

somehow authorized and compensable as time worked.  In support of this position,

Sheehy cites an out-of-context snippet of his union president's arbitration

testimony to support his claim that "[he] was permitted by VTA to take a 10-7B

break at Alum Rock station without calling dispatch" and that "VTA did not

require [him] to request approval from the dispatcher (or any other person) before

taking a 10-7B break at Alum Rock station." [ER 42:25-28.]  Sheehy's self-serving

statements are both misleading and refuted by the evidence.

First of all, the snippet of his union president's arbitration testimony Sheehy

cites to support his contention is particularly troubling.  Specifically, Sheehy notes

the following to argue that he did not need authorization for his arbitrary breaks:

> Q.    Have you known any operator to request a 15-minute overtime request
>       for a 10-7B every single day of his run, for more than two years?
> A.    I did it.
> Q.    Every single day for more than two years?
> A.    I did it.
> Q.    And did you receive an approval for those requests –
> A.    Yes, I did.
> Q.    – every single day for two years?
> A.    Yes, I did.
> [Opening Brief, p.15, citing from ER 84.]

Yet what the witness admits immediately following the above testimony, which

Sheehy has conveniently omitted in his Opening Brief, puts her testimony in its

proper context:

> Q.    But, you're for bus; correct?  You never operated a Light Rail?
> A.    Operator's an operator.
> Q.    Well, you're a bus operator –

A.   Yes.

Q.   – not a Light Rail operator; correct?

A.   Yes.

Q.   Okay.  Do you know of any Light Rail operators who've asked for 15 minutes' overtime every single day for more than two years, because they had to go to the bathroom –

A.   No.

Q.   – other than Mr. Sheehy?

A.   I have no idea.

[ER 84-85.]

The union president's testimony about her experiences as a bus operator is hardly relevant to prove that Sheehy's arbitrary breaks were authorized, however, it is important to note that Sheehy's claims (i.e. that "[he] was permitted by VTA to take a 10-7B break at Alum Rock station without calling dispatch" and that "VTA did not require [him] to request approval from the dispatcher (or any other person) before taking a 10-7B break at Alum Rock station") are also misleading in a variety of ways.  For example, Sheehy's claim that "VTA did not require me to request approval from the dispatcher (or any other person) before taking a 10-7B break at Alum Rock station" suggests that his arbitrary 10-7B breaks were implicitly approved.  This was not the case.  To begin with, it is a logical fallacy to conclude that not requiring approval equates to approval itself.  Nonetheless, setting aside the faulty reasoning, Sheehy strategically employs the term "dispatcher" to make his self-serving point.  Contrary to what the title may suggest, VTA light rail "dispatchers" are not responsible for taking calls from rail operators nor are they empowered to authorize unscheduled bathroom breaks.  [ER 37:24-

19

28.]  Those responsibilities belong to Rail Control Supervisors at OCC. [ER 37-38.]  While VTA may not have required Sheehy to request approval from a "dispatcher," VTA did require Sheehy, under the express written provisions set forth in VTA Light Rail Operating Rulebook, to call the Operational Control Center ("OCC") if he was late in leaving a terminal by more than two minutes after his/her scheduled departure time. [ER 37-40.]  Under this policy, Rail Control Supervisors who work at OCC – not "dispatchers" – are responsible for taking such calls to coordinate scheduling issues, and, when necessary, authorize personal breaks that may impact an operator's train schedule. [ER 37-38.]  It is simply disingenuous for Sheehy, a light rail operator with more than twenty years of experience with the organization, to suggest that his unscheduled breaks at Alum Rock Station were "approved" by VTA given the clear requirements set forth in the VTA Light Rail Operating Rulebook.

It should come as no surprise that VTA – a public transportation agency tasked with the responsibility of, quite literally, keeping its trains running on time – requires its light rail operators to adhere to an established schedule.  As evidenced by the aforementioned written policy, VTA's routine audits, and Sheehy's work schedule, VTA maintains tight control of its operations.  In this context, Sheehy's bald assertion that VTA "permitted" his arbitrary breaks at Alum Rock Station is inconceivable.  And Sheehy's bald assertion, in the absence of any evidence, that

VTA's rules regarding its scheduled rail operations was "superseded by VTA's own practices" (i.e. essentially that VTA's failure to formally discipline him constituted implicit authorization for Sheehy's bathroom breaks) confuses VTA's willingness to work with its employees as a weakness in the present case. To be certain, the arbitrary bathroom breaks that Sheehy decided to take at Alum Rock were *not* a part of his schedule. VTA has a written policy that prohibits taking arbitrary breaks without first calling the Operations Control Center and obtaining express permission from a Rail Control Supervisor. [ER 38.] In fact, Supervisor Broock consistently denied Sheehy's overtime requests precisely because Sheehy's arbitrary breaks were unauthorized and there was no legitimate basis for him to be taking an additional 10-7B at Alum Rock, already having enjoyed 1 hour and 37 minutes of breaks throughout his shift. [ER 392:20-24.] While Sheehy's superiors may have exercised uncommon restraint in deciding not to proceed with formal discipline against Sheehy, they made it explicitly clear that his overtime requests based on his arbitrary bathroom breaks are improper. They reaffirmed this by presenting their investigative findings to Sheehy's union representative and rejecting the union's request for overtime pay. [ER 295:18-24, 300-380.] In light of these undisputed facts, Sheehy's bald assertion that his arbitrary bathroom breaks were authorized is baseless.

## B. Sheehy Cannot Meet His Burden to Show a "Willful" Violation.

"[T]he party claiming an exception to the normal [two-year] period bears the burden of showing the violation was willful in order to trigger the extended three-year period." *Nelson v. Waste Mgmt. of Alameda County, Inc.*, 33 Fed. Appx. 273, 274 (9th Cir. Cal. 2002). "Mere negligence by the employer in determining its legal obligation is not sufficient; there must be evidence that the employer affirmatively knew it was violating the FLSA or that it was acting with 'reckless disregard' of the FLSA." *Id.*

For reasons stated previously, no liability exists for overtime in this case. Sheehy manufactured the basis for overtime by deliberately prolonging the end of his shift. Nonetheless, assuming *arguendo* that any liability exists under the FLSA, Sheehy will be unable to meet his burden of proving that a "willful" violation occurred in this instance.[10] Overwhelming evidence – not subject to legitimate dispute – aptly demonstrates that VTA acted in good faith and with due regard for Sheehy's rights under the FLSA. In contrast, "evidence" offered by Sheehy to show that a three-year statute of limitations applies merely misconstrues

---

[10]     In his Appellate Brief, Sheehy points out that the District Court "appears to acknowledge that the Ninth Circuit consider the question of willfulness a mixed question of law and fact." [Appellate Brief, p. 29.] It is of equal import to note that "[w]here a case turns on a mixed question of law and fact and, as here, the only disputes relate to the legal significance of undisputed facts, 'the controversy collapses into a question of law suitable to disposition on summary judgment.'" *Blue Lake Rancheria v. U.S.* (9th Cir. 2011) 653 F.3d 1112, 1115, internal citations omitted.

a layperson's testimony and is insufficient to trigger the three-year statute of limitations.

The facts relevant to the underlying analysis are not in dispute. At all times, VTA acted in good faith to comply with the FLSA. When Sheehy started submitting extra pay requests, Supervisor Broock gave Sheehy the benefit of the doubt and granted his overtime requests for the first several weeks. [ER 390:12-17, 395-400.] Even after discovering that Sheehy was delaying his schedule to seek overtime pay, Superintendent Stanislaw waited for corroborating evidence from Transit Division Supervisor Broock and Field Supervisor Cross to make his final determination on the matter. [ER 295:9-13.] And even after the initial denial, they continued to engage with Sheehy and his representatives. On February 15, 2011, Superintendent Stanislaw met with Sheehy's union representative to explain his findings and the reasons for denying Sheehy's overtime requests. [ER 295:18-24, 300-380.] When Sheehy persisted and added another reason ("Also took 10-7B at Alum Rock") to his continued requests for overtime, Supervisor Broock, Superintendent Stanislaw, and VTA's Risk Management Division staff engaged Sheehy to ascertain whether there might be a medical condition that might justify workplace accommodations. [ER 295-296, 382-388.] Their concerted efforts to work with and engage Sheehy to ascertain the basis for his overtime requests prior

23

to denying his requests preclude a finding that VTA acted recklessly in the instant matter.

In stark contrast, the snippet of Supervisor Broock's arbitration testimony, which Sheehy presents as "evidence" to argue that VTA "willfully" violated the FLSA, is insufficient to prove that a three-year statute of limitations applies:

> "Q.    And VTA knew, from his extra pay request, that [Sheehy] was requesting overtime.
> A.    That's correct
> Q.    And VTA *willfully* chose not to pay it; correct?
> A.    Correct."
> [Opening Brief, p. 28, *emphasis added.*]

Supervisor Broock's affirmative answer merely confirms that VTA acted with all due consideration, without haste, when denying Sheehy's overtime requests. Sheehy's attempt to prey on a layperson's understanding of the word "willful" to make the argument that VTA acted in "reckless disregard" of the FLSA is ineffectual.

## C.    Sheehy's Appeal is Frivolous and Sanctionable.

Federal Rules of Appellate Procedure, Rule 38 provides that "[i]f a court of appeals determines that an appeal is frivolous, it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee."  In the instant matter, VTA separately filed its motion on July 20, 2015 after its attempt to informally resolve this matter with counsel proved fruitless.  Sheehy had a reasonable opportunity to

respond and filed his opposition on July 29, 2015.  Pursuant to the Appellate

Commissioner's Order dated November 20, 2015, VTA renews its arguments in

this answering brief for sanctions against Sheehy and his counsel.

**1.    Sheehy and his counsel are subject to sanctions for mischaracterizing the record and the law.**

An appeal is frivolous when it mischaracterizes the record and/or the law.

*Frunz v. City of Tacoma*, 476 F.3d 661, 665 (9th Cir. 2007) (appellants subject to

pay attorney fees and double costs under FRAP 38 for persisting in distorting the

facts "when a simple check of the record would have disclosed the problem and

given [appellants] an opportunity to correct their earlier misstatements"); *Malhiot*

*v. S. California Retail Clerks Union*, 735 F.2d 1133, 1138 (9th Cir. 1984)

(damages awarded against counsel whose brief contained "many

misrepresentations of the record and an intentional misstatement of California

law").  Here, Sheehy and his counsel (Benjamin K. Lunch and William Flynn) are

subject to sanctions for bringing an appeal based entirely on misrepresentation of

the record and the law.

Sheehy persisted in filing fraudulent extra pay requests for years, and his

counsel disregarded numerous opportunities to inform their client that the

underlying overtime claim is unjustified.  As indicated previously, Sheehy's bald

assertions (i.e. that he was "often late in arrival at the yard" prior to the schedule

change and that his arbitrary breaks were somehow authorized) and selective

25

citations from the arbitration transcript are incompatible with the incontrovertible facts reflected in the evidence. As such, his counsel's reliance on the FLSA is entirely misplaced. Sheehy's deliberate delay of his schedule at the end of his run (i.e. spending approximately 15 minutes lingering at Alum Rock Station at the end of his shift) was not "an integral and indispensable part of the principal activities" of the employee under the FLSA. 29 USC §254(a)(2); *See also Steiner v. Mitchell,* 350 U.S. 247, 256 (1947). Likewise, counsel's citation of the Fifth Circuit in *Skipper v. Superior Dairies, Inc*. to assert that "the FLSA requires payment for all compensable hours worked by an employee" is inapposite to the facts of his case.[11] *Skipper* did not involve an employee fraudulently seeking overtime. Rather, the plaintiff in the case, Richard Skipper, was a delivery man, seeking overtime payment for the time that he spent hauling dairy products to some 20 or more stores that had direct business arrangements with his employer. In stark contrast to Skipper who labored long hours making deliveries each day, Sheehy *avoided* work by purposely delaying his return to the Yard every night. Moreover, Sheehy manufactured a reason (*i.e.,* that he could not make it back to the Yard in time because VTA reduced his schedule by 5 minutes) to deceive his employer and obtain 15 minutes of overtime compensation (*i.e.,* 22.5 minutes of regular pay) for the delay that he created. Sheehy's counsel cannot justly compare their client with

---

[11]     *Skipper v. Superior Dairies, Inc.* (5th Cir. 1975) 512 F.2d 409, 419.

Richard Skipper, who spent long hours working for the benefit of his employer –

hours, which the Fifth Circuit aptly determined to be "compensable hours *worked*

by an employee."[12]

Similarly, counsel's reliance on 29 CFR 785.18 to suggest that his bathroom

breaks should be paid, because "[r]est periods between 5 and 20 minutes are

considered time worked" is misplaced. Again, the record fails to comport with

Sheehy's bald assertion that his arbitrary breaks were somehow authorized.

Evidence is clear: VTA (1) has a clear written policy that prohibits light rail

operators from taking arbitrary breaks without first calling the Operations Control

Center and obtaining express permission from a Rail Control Supervisor [ER 38];

(2) consistently denied Sheehy's requests citing the arbitrary break as one of the

reasons for his overtime request; and (3) actively tried to engage Sheehy to provide

medical documentation for his purported need to use the restroom to sort out this

---

[12]    By loosely associating incompatible facts with the law, counsel for Sheehy has turned the very purpose of the FLSA (*i.e.,* "to aid the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage.") on its head. Here, Sheehy has a stable job with VTA that spanning over three decades. [ER 265.] During the relevant time period in question, his regular hourly pay rate ranged from $28.88 to $30.12. [ER 390.] He is represented by AFL-CIO Division 265 of the Amalgamated Transit Union, which exercises considerable bargaining power to address grievances. This is not a situation where a maltreated and disadvantaged worker is relying on the FLSA to fight for his rights. Rather, it is a case in which an entitled employee is manipulating the system for personal gain.

issue. No genuine issue exists as to any of these points. Nothing in the wage and hour regulations permits Sheehy to receive additional compensation for arbitrarily delaying his work schedule. Any reference to suggest otherwise is a mischaracterization of the law.

As for the CBA, counsel for Sheehy misconstrues its provisions to wrongly suggest that Sheehy's arbitrary bathroom break is compensable. Specifically, Part B, Section 14 of the parties' CBA provides that "[a]ll [m]eal/[r]est periods where applicable are paid and computed as time worked… [and be] distributed as evenly as possible throughout the workday." [ER 186.] As reflected in Sheehy's schedule, which VTA produced as evidence, Sheehy enjoyed regular meal/rest periods that were evenly distributed throughout his workday, totaling 1 hour and 37 minutes. [ER 392.] Sheehy's arbitrary bathroom break, which caused his 15-minute delay, was not a part of this schedule. Again, no genuine issue exists as to any of these facts. Accordingly, counsel's argument that the CBA provides the basis for overtime compensation for Sheehy's delays misconstrues the CBA.[13]

### 2. Sheehy's counsel has breached their duty in pursuing this unjustified appeal.

---

[13] Sheehy indicates that it has been long established under the FLSA that "rest periods (of 5 to 20 minutes) are compensable" and that "[t]his long established legal principle is also found in the text of the collective bargaining agreement between VTA and Mr. Sheehy's union, ATU, Local 265." [Appellant's Opening Breif, p.23.]

As this Court has indicated, "lawyers have a duty to inform a client that his claim is unjustified." *Taylor v. Sentry Life Ins. Co.*, 729 F.2d 652, 656-657 (9th Cir. 1984). Here, Counsel for Sheehy breached their duty to inform their client that his baseless claim for overtime is unjustified. No excuse exists for counsel's breach of duty regardless of how adamant Sheehy may have been about pursuing this appeal, "since there is an ethical obligation to decline employment by a client who wishes to present a claim that is not warranted." *McConnell*, 661 F.2d at 118-119.

Here, counsel for Sheehy ("Counsel"), had every reason to know that their Sheehy's claims were devoid of merit, given their early involvement with their client. In labor dispute matters, Local 265, to which Sheehy belongs, is exclusively represented by Counsel. [DktEntry 16-2, Declaration of Paul D. Ahn ("PDA Decl.") ¶4.] Pursuant to the collective bargaining agreement between VTA and Local 265, Sheehy is able to seek an Informal Hearing to present facts and evidence to resolve issues regarding overtime pay. [*Id.*, ¶2, Exhibit A; ER 151.] If dissatisfied with the Informal Hearing Decision, Sheehy has the opportunity to invoke Labor Arbitration before a neutral arbitrator selected by the parties. [DktEntry 16-2, PDA Decl.; ER 152-154.] Sheehy did both, and, notably, Counsel represented Sheehy at the Labor Arbitration stage of these proceedings. [DktEntry 16-2, PDA Decl., ¶ 3.] At the very outset, in preparing for the arbitration hearing,

Counsel should have discovered the weaknesses of Sheehy's claims and advised their client accordingly.

If, for some reason, Counsel could not discover the infirmity of Sheehy's claims prior to the arbitration, they certainly learned of it at the hearing. There, VTA presented the same detailed facts and evidence that it was later forced to rehash in the district court and here before the Ninth Circuit. Counsel heard direct testimony from and had the opportunity to cross examine three transit supervisors – Transit Division Superintendent Garry Stanislaw, Transit Division Supervisor Janice Broock, and Field Supervisor John Cross – who investigated Sheehy's overtime claims. [ER 294-296, 389-393, 659-660, 662.] Counsel received, as part of VTA's evidence, the train arrival and departure data that conclusively showed that what Sheehy was claiming could not be true. [639-649, 656-658.] Counsel also learned that ATU Local 265 Shop Steward Randeep Singha, who represented Sheehy in investigating his unpaid overtime claim, had previously stopped advocating for Sheehy when presented with evidence to show that his reasons for overtime were false. [ER 295, 300-380.]

If these facts, which are fatal to Sheehy's claims of overtime, were difficult to accept during the arbitration hearing itself, Counsel certainly had time to consider them with greater reflection after receiving Arbitrator Thomas Angelo's decision. Arbitrator Angelo found that VTA has presented "ample and convincing

30

evidence that [Sheehy's] delays and overtime at issue in this case were not the result of the five-minute reduction in the schedule but instead [Sheehy's] own manufacture." [DktEntry 16-2, PDA Decl. ¶3, Exhibit B.] Arbitrator Angelo minced no words when he flatly declared in his decision that Sheehy's "grievance has no merit." [*Id*.]

Yet, despite all this, Counsel proceeded to file an FLSA action on behalf of Sheehy in the U.S. District Court. [ER 666-672.] Counsel further deepened the breach of their ethical obligations to their client by opposing VTA's Motion for Summary Judgment without offering any new facts or material evidence to support Sheehy's claims. [PDA Decl. ¶5, Exhibit C.] And when Magistrate Judge Paul S. Grewal, reviewing all evidence in the light most favorable to Sheehy, determined that "there is no genuine issue of material fact in this case" and dismissed Sheehy's case in its entirety, Counsel received yet another conclusive finding from a neutral party that their client's claims are without merit. [ER 004.]

On July 7, 2015, VTA, as a professional courtesy, VTA reached out to Counsel over the phone and in writing to express concerns about Sheehy's appeal before the Ninth Circuit and sought to resolve this matter informally. [DktEntry 16-2, PDA Decl. ¶6, Exhibit D.] Counsel remained obstinate over the phone and, shortly thereafter, responded in writing to dismiss the points raised over the phone

and in the letter (i.e. the same points that VTA now raises in this motion) and affirm that they "do not plan to withdraw the appeal." [*Id.*, Exhibit E.]

For these reasons, sanctions are appropriate under Federal Rules of Appellate Procedure, Rule 38 deter frivolity in matters before the Court and compensate VTA for the expense of having to defend a meritless appeal.

## V. CONCLUSION

Based on the forgoing, VTA respectfully requests that the judgment of the district court be upheld and that the Court impose appropriate sanctions, double costs, and attorney's fees against Sheehy and his counsel for bringing this frivolous appeal.

Respectfully submitted,

DATED: December 18, 2015    Santa Clara Valley Transportation Authority

_____s/Paul D. Ahn_____
ROBERT FABELA
PAUL D. AHN

Attorneys for Defendant-Appellee
Santa Clara Valley Transportation Authority

## VI. CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure, Rule 32(a)(7)(C), I certify that the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 7,685 words.

Respectfully submitted,

DATED:  December 18, 2015

Santa Clara Valley Transportation Authority

_____s/Paul D. Ahn_____
ROBERT FABELA
PAUL D. AHN

Attorneys for Defendant-Appellee
Santa Clara Valley Transportation Authority

## VII.   STATEMENT OF RELATED CASE(S)

Pursuant to Ninth Circuit Rule 28-2.6, Appellee is unaware of any related case pending before this court.

Respectfully submitted,

DATED:  December 18, 2015    Santa Clara Valley Transportation Authority

_____s/Paul D. Ahn_____
ROBERT FABELA
PAUL D. AHN

Attorneys for Defendant-Appellee Santa Clara Valley Transportation Authority

## PROOF OF SERVICE BY E-FILING

I, the undersigned, declare:

I am a citizen of the United States, over 18 years of age, employed in Santa Clara County, and not a party to the within action. My business address is Santa Clara Valley Transportation Authority, 3331 North First Street, Building C-2, San Jose, California 95134-1906, and is located in the county where the service described below occurred.

On **December 18, 2015,** I served the within by electronic filing:

### BRIEF OF APPELLEE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system on **December 18, 2015**. I certify that all participants in the case are registered CM/ECF users ant that service will be accomplished by the appellate CM/ECF system.

_____s/ Paul D. Ahn_____
PAUL D. AHN